UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                  :

UNITED STATES OF AMERICA,       :

                                    :

           - v. -             :                        **S1 22 Cr. 206 (ER)**

                                    :

STANISLAV YAKUBOV,         :
    a/k/a "Steve,"              :

                                      :

                Defendant.       :

                                      :

------------------------------------------------------ x

## THE GOVERNMENT'S OPPOSITION TO THE
## DEFENDANT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Mathew Andrews
Andrew K. Chan
Thomas John Wright
Assistant United States Attorneys
     *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................... 1

I.   EVIDENCE OF ALL STOLEN JEWELRY THAT WAS OBTAINED AND SOLD BY MEMBERS OF THE MONEY LAUNDERING CONSPIRACY IS ADMISSIBLE ................... 1

   A. FACTS ................................................................................................................. 2
   B. APPLICABLE LAW .............................................................................................. 3
   C. DISCUSSION ....................................................................................................... 4

II.   THE DEFENDANT'S AUGUST 2020 STATEMENTS WERE PROPERLY DISCLOSED AND ARE ADMISSIBLE ............................................................................................. 8

   A. FACTS ................................................................................................................. 9
   B. APPLICABLE LAW .............................................................................................. 10
   C. DISCUSSION ....................................................................................................... 11

III.   THE JURY IS ENTITLED TO HEAR EVIDENCE THAT THE DEFENDANT OBTAINED A NEW CELLPHONE RIGHT AFTER HE WAS FIRST QUESTIONED BY LAW ENFORCEMENT ............................................................................................... 13

IV.   RECORDS FROM THE DEFENDANT'S OWN BUSINESS AND LEADS ONLINE, AND TESTIMONY OF INDUSTRY PRACTICE REGARDING ANTI-MONEY LAUNDERING ARE ADMISSIBLE AND HIGHLY PROBATIVE ........................................ 15

   A. FACTS ................................................................................................................. 16
      1. The Defendant's Business Records and Leads Online ............................... 16
      2. Industry Practice Regarding Money Laundering ...................................... 17
   B. APPLICABLE LAW .............................................................................................. 18
   C. DISCUSSION ....................................................................................................... 19

CONCLUSION ........................................................................................................... 23

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in response to the motions *in limine* of Defendant Stanislav Yakubov, a/k/a "Steve," which the defendant filed on December 22, 2022 and which the Court should deny in their entirety.

## ARGUMENT

**I.    Evidence of All Stolen Jewelry That Was Obtained and Sold by Members of the Money Laundering Conspiracy Is Admissible**

At the outset, the defendant argues that the jury should only be permitted to receive evidence regarding four Hobbs Act robberies committed by a robbery crew (the "Robbery Crew") between October 2019 and February 2020 pursuant to Federal Rules of Evidence 401 and 403. Specifically, the defendant argues that he did not purchase the proceeds of any other robberies committed by members of the money laundering conspiracy, and so other acts committed by co-conspirators in the money laundering conspiracy are not admissible at trial against him. The defendant's motion should be denied because it fundamentally misunderstands the charges against him: The defendant is not charged in the S1 22 Cr. 206 (ER) Indictment (the "Indictment") with purchasing stolen watches on four different occasions. Rather, the defendant is charged with participating in an ongoing money laundering conspiracy between in or around October 2019 and in or around November 2020. As a result, other overt acts committed by members of the money laundering conspiracy are admissible to prove the existence of the conspiracy, as well as the defendant's willful participation in the conspiracy. Additionally, all the overt acts that the Government seeks to admit at trial are highly relevant not only to the defendant's guilt with respect to Count One of the Indictment, but also the false statements that the defendant made to law enforcement that are the subject of Counts Two and Three of the Indictment. As a result, the jury should be permitted to receive evidence of these overt acts

1

committed by other co-conspirators—including other Hobbs Act robberies—even if the defendant did not personally launder the proceeds from those robberies.

**A. Facts**

At trial, the Government anticipates presenting evidence regarding the following robberies that were committed by members of the money laundering conspiracy, including evidence of how the proceeds from those robberies were laundered afterwards by the defendant or other "fences":

- On or about October 3, 2019, a jeweler was robbed of a Richard Mille watch, which was sold to the defendant (the "October 2019 Robbery-1").

- On or about October 25, 2019, a jeweler was robbed of a Rolex Sky Dweller watch, which was sold to the defendant (the "October 2019 Robbery-2").

- On or about December 10, 2019, a jeweler was robbed of a Patek Philippe watch, which was sold to the defendant (the "December 2019 Robbery").

- On or about January 14, 2020, a jeweler was robbed of a Richard Mille watch, which the defendant declined to purchase, telling a member of the Robbery Crew that the watch was "too hot" (i.e., would too likely lead to law enforcement detection).  Members of the Robbery Crew then attempted to sell the watch to a jeweler in Brooklyn, who returned the watch to its original owner (the "January 2020 Robbery").

- On or about February 16, 2020, a jeweler was robbed of an Audemars Piguet ("AP") watch, which was sold to the defendant (the "February 2020 Robbery-1")

- On or about February 20, 2020, an individual was robbed of an AP watch, which the defendant declined to purchase because it was "too hot".  Members of the Robbery Crew then sold the watch to an individual based in the Diamond District named "Russo", and they later discussed buying back the stolen watch from "Russo" and trying to resell it to the defendant or another fence (the "February 2020 Robbery-2").

- On or about June 11, 2020, a jeweler was robbed of a Richard Mille watch, which was eventually sold to a fence in Harlem.  When interviewed about the Robbery Crew in or around October 2020 and in or around March 2021, the defendant mentioned hearing about independent jewelers in New York City being robbed, and specifically mentioned this jeweler by nickname when discussing the various jewelers that had been robbed (the "June 2020 Robbery").

- On or about July 6, 2020, a jeweler was robbed of a Richard Mille watch.  Just minutes after the robbery occurred, members of the Robbery Crew contacted the defendant to discuss selling the watch to him.  The defendant responded that the stolen watch was fake, and so the watch was not ultimately sold (the "July 2020 Robbery").

- On or about July 14, 2020, members of the Robbery Crew attempted to rob a jeweler ("Jeweler-1") of a Richard Mille watch.  Following the attempted robbery, a member of the Robbery Crew attempted to extort Jeweler-1 for the Richard Mille watch and/or money by threatening to commit violence against Jeweler-1 and Jeweler-1's family.  In an attempt to see whether another jeweler was assisting the Robbery Crew—like the defendant—Jeweler-1 told other jewelers that the FBI was quickly closing in on the identities of the robbery crew and "knew everything" about how the Robbery Crew operated.  The defendant then reached out to Jeweler-1 and scheduled a meeting with law enforcement in or around August 2020 (the "July 2020 Attempted Robbery").  The defendant told Jeweler-1 that members of the Robbery Crew had reached out to the defendant asking for Jeweler-1's address, but the defendant denied giving Jeweler-1's address to the Robbery Crew.

- On or about August 2, 2020, members of the Robbery Crew robbed a social media influencer and food critic of a Richard Mille watch.  Immediately after the robbery, members of the Robbery Crew went to the defendant's home to sell the watch.  The defendant met with members of the Robbery Crew outside of his home and told the Robbery Crew that he was willing to purchase the watch the next day.  Because of concerns that the defendant might be speaking to law enforcement, the Robbery Crew did not ultimately sell this watch to the defendant.  The defendant later provided clips from this meeting to law enforcement.

### B. Applicable Law

It is well settled in the Second Circuit that "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged."  *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (quotation marks and alterations omitted);  *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("explaining that [a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather it is part of the very act charged."); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003) (same).

Even where a particular act cannot be described as an overt act in furtherance of a con-
spiracy, the Second Circuit has held that "evidence of uncharged criminal activity is not
considered other crimes evidence under Rule 404(b) if it arose out of the same transaction or
series of transactions as the charged offense, if it is inextricably intertwined with the evidence
regarding the charged offense, or if it is necessary to complete the story of the crime on trial."
*United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110
F.3d 936, 942 (2d Cir. 1997)); *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)
(explaining that evidence of other acts is admissible to "provide background for the events
involved in the case" and "to provide the jury with the complete story of the crimes charged by
demonstrating the context of certain events relevant to the charged offense").  "Background
evidence may be admitted, for example, to furnish an explanation of the understanding or intent
with which acts were performed or the meanings of conversations."  *United States v. Skowronski*,
968 F.2d 242, 246 (2d Cir. 1992).  When a testifying witness was a participant in these prior acts,
the Government is also entitled to "elicit testimony during direct examination that exposed
details damaging to their credibility."  *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir.
1991).  In doing so, the Government is "able to avoid the appearance that it was concealing
impeachment evidence from the jury."  *Id.* (citing *United States v. Louis*, 814 F.2d 852, 856 (2d
Cir. 1987); *see also United States v. Hamilton*, 3 F. App'x 7, 11 (2d Cir. 2001) (same).

### C. Discussion

Applying the principles set forth above, the jury should be allowed to receive evidence
regarding all the robberies that were committed by members of the money laundering conspiracy
between in or around October 2019 and in or around November 2020.  To begin with, the
defendant is charged in Count One of the Indictment with participating in a money laundering

conspiracy that lasted during this entire timeframe, and the Government must prove that the monetary transactions contemplated by this conspiracy involved the proceeds of Hobbs Act robberies.  As a result, the Government must be allowed to prove that the conspiracy was ongoing during this entire timeframe, and members of the conspiracy continued to attempt to obtain and launder the proceeds of Hobbs Act robberies, even if the defendant did not personally purchase any stolen jewelry between in or around February 2020 and in or around November 2020.  Put simply, the Government has the burden of proving the existence of a money laundering conspiracy, and other overt acts committed by members of the conspiracy are clearly admissible to prove this element of Count One.  *See Thai*, 29 F.3d at 812 (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself").

        In any event, the overt acts described above are also highly relevant to the defendant's participation in the charged money laundering conspiracy because they show the defendant's continuing role as one of the fences for the Robbery Crew and his knowledge of the Robbery Crew's operations.  For example, members of the Robbery Crew attempted to sell stolen jewelry to the defendant after the January 2020 Robbery, the February 2020 Robbery-2, the July 2020 Robbery, and the August 2020 Robbery.  The defendant's continuing relationship with members of the Robbery Crew, and his willingness to speak with them by telephone and even meet with them outside of his own home following these robberies is powerful proof of the defendant's continuing membership in the money laundering conspiracy—in addition to the four specific instances where the defendant purchased stolen watches from the Robbery Crew earlier on in the conspiracy.  The defendant's continued willingness to associate with members of the Robbery Crew between February 2020 and August 2020 also speaks volumes about his state of mind and absence of mistake when he purchased the stolen watches between October 2019 and February

2020.  Similarly, with respect to the June 2020 Robbery and the July 2020 Attempted Robbery, the defendant made statements about these robberies to law enforcement, and the jury will only be able to fully understand the significance of these statements if they hear additional evidence about how these robberies were carried out.  For example, with respect to the June 2020 Robbery, the defendant told law enforcement that he had heard about the victim of the June 2020 Robbery being robbed of a Richard Mille watch and being shot during the robbery—matching the victim's description of how the robbery was carried out.  Similarly, the defendant told law enforcement and Jeweler-1 that members of the Robbery Crew had asked him for the address of Jeweler-1 prior to the July 2020 Attempted Robbery.  The jury will only be able to fully understand Jeweler-1's actions and the defendant's actions after the July 2020 Attempted Robbery if Jeweler-1 is able to describe to the jury his interactions with the Robbery Crew during the July 2020 Attempted Robbery and the subsequent extortion attempts.

Simply put, all of this evidence regarding the continuing and ongoing activities by members of the money laundering conspiracy is powerful proof that the defendant was not acting in good faith when he was meeting with members of the Robbery Crew and agreeing to purchase stolen jewelry from them during this timeframe.  Additionally, the evidence shows that the defendant lied to law enforcement in October 2020 and March 2021 when he falsely claimed that he had never purchased any jewelry from members of the Robbery Crew and had only interacted with them as customers who had purchased jewelry from him on one or two occasions in the past.  To appreciate the willful and false nature of these misrepresentations, the jury needs to understand all the evidence about the defendant's repeated interactions with the Robbery Crew over the course of the entire conspiracy.  For all these reasons, the jury should be allowed to consider evidence of other robberies committed by members of the money laundering conspira-

cy, as well as the defendant's role in these overt acts, to fairly evaluate the defendant's guilt with respect to Counts One through Three of the Indictment. *See Carboni*, 204 F.3d at 44 (holding that evidence is not considered Rule 404(b) evidence "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial"); *Skowronski*, 968 F.2d at 246 ("Background evidence may be admitted, for example, to furnish an explanation of the understanding or intent with which acts were performed or the meanings of conversations.").

Finally, evidence of the overt acts described above is admissible under Rule 403.  To begin with, none of the resulting prejudice from these overt acts is "unfair" for purposes of Rule 403 because the evidence directly bears upon the defendant's guilt of the crimes charged in the Indictment. *See Constantino v. David M. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (citing *Weinstein's Federal Evidence*, § 403.04[1][a] (2d ed. 1997) (citing cases)); *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.").  Additionally, the defendant does not dispute that the Government is entitled to present evidence to the jury of the October 2019 Robbery-1, the October 2019 Robbery-2, and the February 2020 Robbery-1—crimes that are just as "sensational or disturbing" as the other overt acts committed as part of the money laundering conspiracy. *See United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (evidence admissible under Rule 403 when the offered evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the defendants] were charged"); *United*

*States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (evidence of uncharged act properly admitted where "it did not involve conduct more inflammatory than the charged crime").  Nor does the defendant dispute that the Government is entitled to present evidence to the jury about other robberies committed by a former member of the Robbery Crew who will testify at trial (the "CW"), and presumably the defendant plans to emphasize the CW's participation in these robberies on cross-examination.  *See Coonan*, 938 F.2d at 1561.  As a result, there is no risk of unfair prejudice to the defendant in allowing the Government to present additional evidence establishing the ongoing operations of the money laundering conspiracy, and the defendant's active role in that conspiracy, even if he did not purchase any stolen jewelry.  Indeed, the factual dispute between the parties about the defendant's continued participation in the money laundering conspiracy after February 2020 demonstrates why the jury should be entitled to receive the evidence.  *See United States v. Ahmed*, 2016 WL 8732355, at *7 (E.D.N.Y. June 24, 2016) ("[B]ecause the evidence is relevant to Defendant's intent, an issue that the Defendant himself has placed in dispute, any resulting prejudice is not unfair."); *see also United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) ("Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence.");.

## II.     The Defendant's August 2020 Statements Were Properly Disclosed and are Admissible

Next, the defendant moves to exclude testimony from retired NYPD Detective Paul Van Eyken. Detective Van Eyken collected video recordings from the defendant's residence in or about August 2020, during which the defendant voluntarily made certain statements. The defendant now argues that his statements were untimely disclosed under Federal Rule of

Criminal Procedure 16(a)(1)(A) and are unfairly prejudicial pursuant to Federal Rule of Evidence 403. These arguments are meritless.

### A. Facts

At trial, the Government anticipates calling retired Detective Van Eyken to testify about collecting surveillance video from the defendant's home in Queens after Jeweler-1 had told the NYPD that members of the Robbery Crew had visited the defendant's home after a robbery. The surveillance video shows two members of the Robbery Crew—including the CW—meeting with the defendant outside of the defendant's home on the same night as the August 2020 Robbery.

At the time, the defendant was not a target or subject in the federal investigation. He was a witness with relevant video surveillance. While Detective Van Eyken was collecting the video, the defendant voluntarily stated, among other things, that: (1) the two men who were depicted in the surveillance footage asked the defendant to purchase a watch; (2) the defendant's residence was not his place of business; (3) the defendant did not know the two men depicted in the video; and (4) the defendant wondered why they would have come to his home. Detective Van Eyken retired from the NYPD in or around January 2021—over a year before the defendant was charged by complaint in March 2022—and did not prepare any reports documenting the defendant's statements during the meeting. As a result, the Government did not become aware of these statements until November 30, 2022, when the Government interviewed Detective Van Eyken in anticipation of calling him as a witness at trial. The Government disclosed to the defendant its interview notes containing the substance of the defendant's statements on December 5, 2022—approximately seven weeks in advance of trial.

**B. Applicable Law**

Federal Rule of Criminal Procedure 16(a)(1)(A) states: "Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial."  Rule 16 does not "bar[] the introduction of evidence that is discovered only shortly before or even during trial, but is promptly disclosed."  *United States v. Rom*, 528 F. App'x 24, 26 (2d Cir. 2013).  To the contrary, Rule 16(c) places on both parties a continuing duty to "promptly" disclose newly discovered evidence or materials that are subject to Rule 16(a)(1)(E), which may occur even during trial.  *See* Fed. R. Crim. P. 16(c) ("A party who discovers additional evidence or material before *or during trial* must promptly disclose its existence to the other party or the court if: (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously requested, or the court ordered, its production." (emphasis added)).

If a party fails to comply with Rule 16, the Court has "broad discretion in fashioning a remedy," which may include granting a continuance or the exclusion of evidence.  *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016); *see also* Fed. R. Crim. P. 16(d)(2)(A)-(D) (a district court may "enter any other order that is just under the circumstances").  "A district court's decision not to exclude evidence that was the subject of a Rule 16(a) violation is not grounds for reversal unless the violation caused the defendant 'substantial prejudice.'"  *United States v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998).  "Substantial prejudice" means "the prejudice resulting from the government's untimely disclosure of evidence, rather than the prejudice attributable to the evidence itself."  *Id.* (quoting *United States v. Sanchez*, 912 F.2d 18, 23 (2d Cir. 1990)); *see also United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997) (in the context of

Rule 16, substantial prejudice means "more than that the statement was damaging to the defendant: the defendant must demonstrate that the untimely disclosure of the statement adversely affected some aspect of his trial strategy").  The Court of Appeals reviews a trial court's choice of remedy for abuse of discretion and will "look to the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances."  *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (quoting *Lee*, 834 F.3d at 159).

### C. Discussion

The defendant's motion to preclude statements made to Detective Van Eyken in August 2020 should be denied.  As an initial matter, there is nothing improper about Detective Van Eyken's failure to take notes.  At the time that the defendant made his statements to law enforcement, he was not a subject or target in the investigation.  He was a witness with relevant surveillance footage.  Indeed, the defendant deliberately furthered this misunderstanding by falsely stating to Detective Van Eyken that he did not know the men who showed up to his house.  While the defendant's lies were subsequently uncovered, Detective Van Eyken cannot be faulted for declining to take notes at the time.  *See, e.g.*, *United States v. Rodriguez*, 496 F.3d 221, 224–25 (2d Cir. 2007) ("We reject Rodriguez's contention that *Brady* or the Confrontation Clause requires the Government to take notes during witness interviews . . . .This is in part because the Government's representative may have no way of knowing, upon hearing a witness's statement, that the statement is inconsistent with what the witness will say at a later time.").

Moreover, there is no violation of the Government's obligations under Rule 16(a)(1)(A) under the plain text of the rule.  Rule 16(a)(1)(A) only applies if the defendant made an "oral statement" *and* "the government intends to use the statement at trial." Fed. R. Crim. P.

16(a)(1)(A).  The Government was unaware that the defendant had made any statements to Detective Van Eyken before November 2022.  The Government therefore did not intend to use the defendant's statements at trial prior to this time.  After meeting with the Detective on November 30, 2022 and learning of the statements, the Government decided that it would use the statements at trial and promptly disclosed their substance to the defendant. As a result, there was no violation of the Government's obligations under Rule 16(a)(1)(A).  *See Rom*, 528 F. App'x at 26.

In any event, even if the Government failed to comply with its Rule 16 obligations—which the Government complied with here—there is no prejudice from the defendant being placed on notice of these statements seven weeks in advance of trial.  In his motion, the defendant does not even allege any prejudice, and there is none.  The defendant is aware of his own statements to law enforcement.  Moreover, the defendant has been free to interview Detective Van Eyken and to adjust his planned strategy at trial.  Given the circumstances under which the Government learned of the defendant's statements and promptly disclosed them, the Government respectfully submits that no remedial intervention from the Court, let alone the exclusion of the statements, is warranted here.

Similarly, the defendant's objection to the relevance and admissibility of his August 2020 statements to law enforcement under Rule 403 completely fails.  The defendant primarily argues that he is not charged with making any false statements in August 2020, and so his statements on that date are irrelevant, cumulative, and create the risk of being treated as propensity evidence.  But none of those assertions is correct.  To begin with, the defendant's statements to law enforcement about the members of the Robbery Crew who visited his home in the middle of the night on August 2, 2020 are powerful evidence of the defendant's state of mind and his

consciousness of guilt.  Among other things, the defendant denied knowing the two men depicted in the video and feigned ignorance about why these two men who would have shown up at his home to sell him a watch—statements that will be proven as demonstrably false and misleading. *See United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) (recognizing that false statements, flight, and witness tampering are probative of a defendant's consciousness of guilt).  Additionally, the defendant's statements in August 2020 are not cumulative or duplicative of the statements that the defendant made to law enforcement in October 2020 and March 2021.  Quite to the contrary, the defendant changed course in his later interviews with law enforcement—admitting that he was familiar with the two men depicted in the video, and admitting that the two men had previously attempted to sell him watches.  The jury should be entitled to consider the defendant's shifting narratives between interviews with law enforcement in deciding whether he is guilty of the charges in the Indictment.  Finally, any concern here that the jury will treat the defendant's false statements in August 2020 as propensity evidence can be easily cured by an appropriate limiting instruction.  Ultimately, the defendant is correct that these statements are prejudicial, they are just not *unfairly* prejudicial in any sense that is of concern to Rule 403.

## III. The Jury Is Entitled to Hear Evidence That the Defendant Obtained a New Cellphone Right After He Was First Questioned By Law Enforcement

Similarly, the defendant argues that the jury should be precluded from receiving evidence about the defendant's new cellphone that he obtained in August 2020—just days after being interviewed by Detective Van Eyken.  When asked about this cellphone in October 2020, the defendant told law enforcement that his cellphone had been damaged and so the data on the cellphone was no longer available to him or to law enforcement.  At trial, the Government will present evidence that the defendant's previous cellphone was one of the primary tools used by the defendant to participate in the money laundering conspiracy—including to communicate with

13

other members of the conspiracy by phone and text message and to send, receive, and create

photographs and videos of the stolen jewelry.   Additionally, the CW will testify that the

defendant was sensitive to the possibility of law enforcement monitoring of his cellphones.

During the meeting outside of the defendant's home following the August 2020 Robbery, the

defendant instructed members of the Robbery Crew to place their cellphones on the roof of their

vehicles, and the defendant did the same.  The Government will argue at trial that the defendant's

destruction of his cellphone was not merely a coincidence, but rather powerful evidence of the

defendant's consciousness of guilt and state of mind.

  The defendant responds that it "would be deeply misleading to suggest that there is any-

thing suspicious in failing to stick with an old phone, when countless people upgrade to the

newest model of the iPhone as a matter of course and Mr. Yakubov was not instructed to do

otherwise."  Def. Motion at 13.  This is utter nonsense.  The Government at trial will introduce a

recording of the defendant from his law enforcement interview on March 24, 2021 during which

*told* law enforcement that he changed his phone because "the other phone, my daughter put it in

the water."  His changing story—before that it was damaged and now that he simply wanted to

"upgrade" his phone—is powerful evidence of consciousness of guilt.  Moreover, to the extent

that defense counsel claims that there are innocent explanations for why the defendant changed

phones, this argument merely goes to the weight—not to the admissibility—of the evidence.  It is

very well-established that proof of a defendant's attempts to destroy evidence of a crime are

relevant and probative at trial as proof of consciousness of guilt.  *See*, *e.g.*, *United States v.*

*Burrous*, 147 F.3d 111, 117 (2d Cir. 1998) (affirming admission of evidence that defendant

convicted of robbing currency from a safe was found throwing currency out of his window by

arresting law-enforcement agents where district court "noted that [the defendant] was free to

argue before the jury that the evidence was not probative on the issue of whether he had

perpetrated the . . . robbery"); *Hodgskin v. United States*, 279 F. 85. 93 (2d Cir. 1922) (affirming

admission of evidence that defendant convicted of conspiring to defraud the United States had

destroyed records of communications between co-conspirators where "the fact of destruction was

relevant to show a course of conduct on the part of [the defendant], showing a consciousness of

guilt, in the sense of attempting to hide all evidence of communication between [co-

conspirators]").  Here, the defendant can certainly argue that there was no nefarious purpose to

his purchase of a new cellphone right after meeting with Detective Van Eyken.  The Government

will argue to the contrary, and the jurors are entitled to receive this evidence and weigh the

arguments of the parties as they see fit.

### IV.    Records from the Defendant's Own Business and Leads Online, and Testimony of Industry Practice Regarding Anti-Money Laundering Are Admissible and Highly Probative

Finally, the defendant moves to preclude any records or evidence relating to legitimate

transactions conducted by the defendant's business and Leads Online, as well as testimony

regarding regulations and commonsense record-keeping practices used by other jewelers in New

York City who purchase second-hand jewelry from the public.  These arguments are meritless.

The defendant's failure to create any records relating to the stolen watches that he purchased

from the Robbery Crew is some of the most powerful and indisputable proof of the defendant's

state-of-mind and intent in purchasing the watches from the Robbery Crew.  Given that the

Government bears the burden of proving that one of the purposes of these transactions was to

"conceal or disguise the nature, the location, the source, the ownership, or the control of the

proceeds of specified unlawful activity," the defendant's failure to create any paperwork or

follow any of the anti-money laundering practices used by the defendant's own business and

15

other jewelers in the industry is critical proof of the defendant's participation in the money laundering conspiracy.

### A. Facts

#### 1. The Defendant's Business Records and Leads Online

At trial, the Government will present evidence that the defendant's business kept and maintained records of legitimate watch transactions, including among other things, receipts, journal entries, and other written notations. The Government will also present evidence that the defendant's business at the time of the money laundering conspiracy possessed a Secondhand Dealer License, a license required by law in New York City for dealers in secondhand goods. During his interview with law enforcement in March 2021, the defendant also stated that he creates receipts for jewelry transactions as a regular practice. The defendant's business prominently posted a copy of its Secondhand Dealer License in the defendant's booth in the Colosseum Mall in Jamaica:



The New York City Department of Consumer and Worker Protection issues the Secondhand Dealer Licenses to jewelers and requires that the jewelers keep a record of every purchase and to maintain copies of the seller's identification.  At the time of the money laundering conspiracy, jewelers in New York City were required to keep these records on Leads Online, a centralized online database for transactions in used jewelry that allows the NYPD to easily run searches for stolen jewelry and to locate jewelry when it has been stolen from victims and resold to secondhand dealers.  Many of the same jewelers who were robbed by the Robbery Crew will also testify about their own compliance with these commonsense rules and regulations and will explain how these practices are designed to ensure that they do not unwittingly purchase stolen jewelry.

Records from Leads Online shows that the defendant's business filed over 20 reports of purchases of jewelry from members of the public between 2013 and 2019, which included the names, addresses, driver's license information of the sellers, as well as descriptions of the jewelry and purchase price for the jewelry.  No such records were created on Leads Online for the defendant's purchase of the watches from the October 2019 Robbery-1, the October 2019 Robbery-2, the December 2019 Robbery, and the February 2020 Robbery-1.  Similarly, law enforcement officers who searched the defendant's business in March 2021 found numerous receipts and records of jewelry transactions, but no records of the watches from the October 2019 Robbery-1, the October 2019 Robbery-2, the December 2019 Robbery, and the February 2020 Robbery-1.

### 2.  Industry Practice Regarding Money Laundering

The Government further intends to call at trial multiple jewelers who were victims of the Robbery Crew (the "Jewelers"). The Jewelers have collectively worked in the jewelry industry

for over 100 years in numerous stores and locations. The Government anticipates that the

Jewelers will testify, among other things, that jewelry businesses assume risk if they buy stolen

watches. If law enforcement locates and seizes a stolen watch, the jewelry business's only means

to recoup its loss is to locate the person who sold the store the stolen item. As a result, the

Jewelers use several commonsense methods to determine whether a watch is stolen. These

include, for instance, making a copy of the seller's identification. They also include asking for

the "box" and "papers" for the watch,[1] and making a receipt of the transaction (a universal

business practice across nearly all industries). The Jewelers will further testify that several of

these commonsense practices—such as copying identification and making a receipt of the

transaction—are required by law for dealers in secondhand goods.

### B. Applicable Law

It is well-established that a defendant's attempts to conceal the receipt of criminal

proceeds is admissible as proof of knowledge, absence of mistake, consciousness of guilt, and to

rebut arguments that the defendant acted in good faith. *See United States v. Valenti*, 60 F.3d 941,

946 (2d Cir. 1995) (defendant's failure to report ill-gotten gains on tax returns were "obviously

probative to refute Valenti's defense that the contested funds were legitimate compensation");

*United States v. Wallach*, 935 F.2d 445, 472 (2d Cir. 1991) (evidence that defendant received a

$150,000 bribe but did not disclose it on his income tax returns showed that "concealment of the

.[] payments was not innocent"); *United States v. Bergstein*, 788 F. App'x 742, 745 (2d Cir.

2019) (proof that defendant did not report or pay taxes on income from suspicious transactions

demonstrated "intent and absence of mistake, was relevant to his claim that his transactions were

---

[1] The "box" is the original packaging of the item when it is sold by a manufacturer. The "papers" are documentation that certify the watch's authenticity, and come with the watch when it is sold by a manufacturer.

legitimate, and was not unfairly prejudicial"); *United States v. Deutsch*, 451 F.2d 98, 115-16 (2d Cir. 1971) (proof that defendant failed to file obligatory monthly report of newly-purchased securities was admissible to show "evasive conduct aimed at concealing the transaction and constituted circumstantial evidence of guilty consciousness"); *United States v. Kurland*, 2022 WL 2669897, at *7 (E.D.N.Y. July 11, 2022) ("Courts in the Second Circuit frequently admit tax evidence in cases involving other types of fraud to show the defendant's plan, lack of mistake, and knowledge that the funds were proceeds of illegitimate activity." (collecting cases)); *United States v. Black*, 2014 WL 5783067, at *5 (E.D.N.Y. Nov. 5, 2014) (finding that defendant's failure to report receipt of money was "inextricably intertwined with the defendant's participation in the money laundering conspiracy"); *see also United States v. Iossifov*, 45 F. 4th 899, 919 (6th Cir. 2022) (finding that district court properly admitted testimony about the "lack of anti-money laundering practices in place and the various ways in which [the defendant] consciously made it easy for fraudsters to launder money").

### C. Discussion

As the Court is aware, the Government at trial bears the burden of proving that the defendant engaged in transactions of stolen watches, knowing that the transactions were designed in whole or in part to disguise or conceal the nature, location, source, ownership, or control of the stolen watches. These inquiries, of course, focus on the defendant's state of mind, which "can only rarely be proved by direct evidence." *United States v. Muse*, No. 06 CR. 600 (DLC), 2007 WL 1989313, at *16 (S.D.N.Y. July 3, 2007), *aff'd sub nom. United States v. Awad*, 369 F. App'x 242 (2d Cir. 2010). Instead, the "purpose and intent elements" of a money laundering charge "may be established by circumstantial proof." *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 695 (S.D.N.Y. 2017); *see United States v. Huezo*, 546 F.3d 174, 181 (2d

Cir. 2008) ("[C]ircumstantial evidence [] presented was sufficient for a rational juror to infer that [defendant] had the requisite criminal knowledge and intent to support his convictions for money laundering and conspiracy to commit money laundering."); *United States v. Gotti*, 459 F.3d 296, 337–38 (2d Cir. 2006) ("[A] conviction of concealment money laundering requires 'evidence of intent to disguise or conceal the transaction, whether from direct evidence, like the defendant's own statements, or from *circumstantial evidence*, like the use of a third party to disguise the true owner, or *unusual secrecy*'" (quoting *States v. Cruzado–Laureano*, 404 F.3d 470, 483 (1st Cir. 2005) (emphasis in original)). Moreover, "[t]estimony as to custom and practice is admissible as circumstantial evidence, subject to the usual condition that its probative value outweigh any possible prejudicial impact." *United States v. Oddo*, 314 F.2d 115, 117 (2d Cir. 1963).

Given that the defendant's intent and state of mind will be a hotly contested issue at trial, the jury must consider all of the defendant's acts and omissions in connection with these transactions, including his failure to generate receipts or invoices, his failure to make a copy of the IDs of members of the Robbery Crew, his failure to generate Leads Online reports, and his failure to inquire about the original packaging or certificates with the watches. To fully appreciate why the defendant's behavior was so unusual during these transactions, the jury must consider how the defendant and other jewelers normally approached and documented transactions involving the purchase of secondhand jewelry from the public. Part of the reason why the defendant's failure to keep records of his transactions with the Robbery Crew is so probative is precisely because the defendant's business regularly prepared these records for legitimate purchases of jewelry from the public—as required by law. Similarly, the jewelers who were victims of the robbery crew have decades of experience in the jewelry industry—just like the

20

defendant—and will testify about why it is standard to incorporate anti-money laundering practices into their businesses.

This testimony is highly relevant at trial and a critical component of the Government's proof of the defendant's state of mind.  The Government intends to prove that the defendant knew that the watches he purchased were stolen, in part, because he declined to follow any of these commonsense or legally prescribed measures in the transactions for the stolen watches. The evidence will show that the defendant is an experienced jeweler with decades of experience in the industry and that his business has a Secondhand Dealer License. Nonetheless, the defendant did not ask for identification from the Robbery Crew, did not inquire whether there were "boxes" and "papers" for the watches, and did not record the transactions in any way, shape, or form (whether by receipt, written notation, or the like). A jury can reasonably infer from these facts that the defendant knew that the watches were stolen and therefore did not ask for documentation.  A reasonable jury can further infer that the defendant declined to make any record of the transactions in order to conceal their stolen provenance.  Moreover, a jury can reasonably infer from these facts that the defendant consciously avoided the fact that the watches were stolen by deliberately failing to engage in even the simplest due diligence.

This evidence is not prejudicial, let alone unduly prejudicial.  The defendant complains that "[r]ecords could have been lost, misplaced, not preserved, or not created in the first place for any number of purchases and for any number of reasons." Def. Motion at 15.  The defendant, of course, is free to argue this inference to the jury.  However, his complaint goes to the weight of the evidence rather than admissibility. *See, e.g.*, *Sec. & Exch. Comm'n v. Genovese*, No. 17 CIV. 5821 (LGS), 2022 WL 16748779, at *6 (S.D.N.Y. Nov. 7, 2022) ("Defendant's dispute about the reasonableness of this inference goes to its weight and not admissibility.").

The defendant further complains that evidence from Leads Online would be prejudicial because there is "no evidence to the effect that the Business made a Leads Online submission for every single watch it purchased between January 1, 2019 and January 1, 2021." Def. Motion at 16. The Government's evidence at trial, however, will show that the defendant's business was obligated to file such submissions under New York City regulations (because it had a Secondhand Dealer License), and the defendant's business did in fact file submissions during this timeframe. The jury accordingly can draw a reasonable inference that the defendant's business was following relevant city rules for legitimate watch transactions.

Lastly, the defendant complains without explanation that "compar[ing] [his] practices with those of other jewelers in New York would be deeply misleading." Def. Motion at 18. The practices of these other jewelers, however, are not esoteric measures known only to a select few.[2] Instead, the evidence at trial will show that their practices are commonsense (and oftentimes legally required) measures used throughout the jewelry industry. Moreover, defense counsel is fully capable of cross-examining the jewelers about their practices, eliciting any significant differences in their practices, and arguing what, if any, inferences to be drawn from the defendant's actions (or lack thereof). Accordingly, the remedy to defense counsel's concerns "is not exclusion of relevant evidence but rather cross-examination . . . , presentation of contrary

---

[2] The defendant reliance on *Villalba v. Consol. Freightways Corp. of Delaware*, No. 98 C 5347, 2000 WL 1154073, at *6 (N.D. Ill. Aug. 14, 2000) is misplaced. There, a plaintiff sought to show that a defendant driver was negligent by introducing an accident report from the defendant's employer that the collision was preventable. The *Villaba* Court excluded this evidence because "the standard for determining preventability and the standard for determining negligence under Illinois law are not necessarily the same." *Id.* at *6. Accordingly, "the two standards may confuse and mislead the jury and result in a mini-trial regarding the different standards and the significance of the preventability finding, diverting attention away from the real issue of negligence." *Villalba* accordingly has nothing to do with the applicability of evidence about industry practice—particularly where, as here, the defendant is a member of the relevant industry.

evidence, and careful instructions to the jury." *U.S. ex rel. Feldman v. van Gorp*, No. 03 CIV. 8135 (WHP), 2010 WL 2911606, at *6 (S.D.N.Y. July 8, 2010).

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motions *in limine*.

Dated:  New York, New York
       January 5, 2023

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney for the
                            Southern District of New York

By:     /s/
                            Mathew Andrews / Andrew K. Chan
                            Thomas John Wright
                            Assistant United States Attorneys
                            (212) 637-6526 / 1072 / 2295