**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X

UNITED STATES OF AMERICA


                           v.

                                                               1:22 Cr. 206 (ER)

        v.

STANISLAV YAKUBOV,


                            Defendant.

--------------------------------------------------------------------X


## DEFENDANT STANISLAV YAKUBOV'S RENEWED MOTION
## <u>FOR A JUDGMENT OF ACQUITTAL</u>

SPEARS & IMES LLP
Max Nicholas
mnicholas@spearsimes.com
767 Third Avenue
New York, New York  10017
Tel: (212) 213-6996
Fax: (212) 213-0849


*Attorney for Defendant Stanislav Yakubov*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................... 1

RELEVANT FACTS AND PROCEDURAL HISTORY ............................................................. 2

    I.    Law Enforcement Interviews of Mr. Yakubov ..................................................................... 2

    II.    The Indictment, Trial and Verdict ....................................................................................... 2

    III.    The Government's Case at Trial ........................................................................................... 4

        a.    Testimony of the Government's Cooperating Witness ................................................ 4

        b.    Evidence Concerning Mr. Yakubov's Knowledge of the Robberies .......................... 7

LEGAL STANDARD ..................................................................................................................... 9

ARGUMENT .................................................................................................................................. 10

    I.    The evidence at trial was insufficient to establish that Mr. Yakubov entered into an
agreement to commit money laundering offenses. ................................................................ 10

        a.    Applicable Law .......................................................................................................... 10

        b.    Argument .................................................................................................................... 11

    II.    The Government failed to offer sufficient proof that Mr. Yakubov knew any watches he
purchased were stolen. ......................................................................................................... 12

        a.    Applicable Law .......................................................................................................... 13

        b.    Argument .................................................................................................................... 14

    III.    The Government failed to prove that Mr. Yakubov engaged in a transaction involving a
financial institution. ............................................................................................................. 16

        a.    Applicable Law .......................................................................................................... 16

        b.    Argument .................................................................................................................... 17

    IV.    The Government failed to establish that the appropriate venue for Counts Two and
Three is the Southern District of New York. ........................................................................ 19

        a.    Applicable Law .......................................................................................................... 19

        b.    Argument .................................................................................................................... 19

CONCLUSION ............................................................................................................................... 20

Defendant Stanislav Yakubov respectfully renews his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.[1]

## PRELIMINARY STATEMENT

Mr. Yakubov was convicted following trial of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One of the Superseding Indictment), and false statements to federal law enforcement officers, in violation of 18 U.S.C. § 1001 (Counts Two and Three of the Superseding Indictment).  Yet, the Government's evidence at trial largely did not concern Mr. Yakubov at all.  Instead, the Government presented in painstaking detail the circumstances of eight robberies of luxury watches – robberies in which Mr. Yakubov did not participate.  The evidence did not demonstrate Mr. Yakubov's awareness of or involvement in the robberies, his agreement to purchase the watches knowing they had been stolen, his use of the jewelry store at which he worked to further this alleged scheme, or even what happened to the watches at issue.  Mr. Yakubov respectfully submits, based on the record at trial, that the Government failed to adduce sufficient evidence that:  (1) Mr. Yakubov entered into an unlawful agreement with others, such that a conspiracy existed; (2) Mr. Yakubov was aware that the watches he purchased were stolen, and thus that he knowingly entered into a money laundering conspiracy; and (3) that any purchase of the watches involved a financial institution, as is required for a conspiracy to commit transaction money laundering to exist.  These failings in the Government's case require a judgment of acquittal on Count One of the Superseding Indictment.

---

[1] In the alternative, Mr. Yakubov respectfully requests that the Court, in the interest of justice, order that a new trial be held.  *See* Fed. R. Crim. P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."); *see also* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.").

In addition to the Government's overcharged money laundering count, Mr. Yakubov was convicted of two counts of making false statements to law enforcement. The Government failed to prove that these charges were properly tried in this District. This too requires a judgment of acquittal. For these reasons, Mr. Yakubov respectfully submits that the Court should vacate the verdict against him and enter a judgment of acquittal as to all counts.

## RELEVANT FACTS AND PROCEDURAL HISTORY

### I.     Law Enforcement Interviews of Mr. Yakubov

On October 20, 2020, New York City Police Department Detective Steven Smith and his partner, Special Agent Antoinette Guzman, conducted an in-person interview of Mr. Yakubov. Tr. 639, 642, 649. At the time, Detective Smith was assigned to assist the U.S. Attorney's Office in the Southern District of New York. Tr. 639. The interview took place in a parking lot in Queens and lasted approximately 45 minutes to an hour. Tr. 642, 666. Mr. Yakubov appeared for the interview voluntarily. Tr. 669.

On March 24, 2021, Special Agent Guzman conducted a second interview of Mr. Yakubov, along with New York Police Department Detective Brian Lukowsky. Tr. 678-79. The interview took place at the store where Mr. Yakubov worked, located in a mall in Jamaica, Queens. Tr. 679. The interview lasted approximately an hour. Tr. 680. Again, Mr. Yakubov voluntarily spoke to the officers. Tr. 686.

### II.    The Indictment, Trial and Verdict

On April 6, 2022, the Government charged Mr. Yakubov in a single-count indictment. (ECF 6, "Original Indictment"). The Original Indictment described eight robberies of luxury watches and alleged that Mr. Yakubov had purchased four of those watches knowing that they were illegally acquired. (*Id.* ¶ 3). Based on those allegations, Mr. Yakubov was charged,

pursuant to 18 U.S.C. § 1956(h), with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("concealment money laundering"), and conspiring to engage in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957 ("transaction money laundering").[2]

On November 17, 2022, the Government obtained a superseding indictment (ECF 29, "Superseding Indictment"), which, without providing detail concerning the watch robberies, alleged that Mr. Yakubov engaged in a conspiracy to launder money and to engage in monetary transactions in illegally obtained property (*id.* ¶¶ 2-3).  In addition to the conspiracy count, the Government charged Mr. Yakubov with two counts of making false statements to law enforcement, based on statements Mr. Yakubov made during the interviews on October 20, 2020 and March 24, 2021, respectively.  (*Id.* ¶¶ 4-5).

Trial commenced with jury selection on January 23, 2023.  On January 30, at the conclusion of the Government's case, defense counsel moved for a judgment of acquittal pursuant to Rule 29 on the grounds that the evidence was insufficient to sustain the verdict, that the Government had failed to show the involvement of a financial institution in the money laundering alleged to be an object of the charged conspiracy, and that venue for the false statement offenses had not been established. Tr. 787-98.  The Court denied the motion on each of the articulated grounds without prejudice to renew following the jury's verdict, if any.[3]  Tr.

---

[2] Although courts employ varying labels for the types of money laundering covered by the statute, at trial alleged violations of Section 1956(a)(1)(B)(i) were referred to as "concealment money laundering" and alleged violations of Section 1957 were referred to as "transaction money laundering."  *See, e.g.*, Tr. 975-76.  This brief uses the same conventions.

[3] The Court set the deadline for submission of the renewed Rule 29 motion as 60 days after trial. Tr. 1054.  April 3, 2023 is the first business day occurring 60 days after trial.  *See* Local Criminal Rule 45.1.

796, 798.  On February 1, the jury found Mr. Yakubov guilty of the three counts in the

Superseding Indictment.

## III.     The Government's Case at Trial[4]

### a.     Testimony of the Government's Cooperating Witness

At trial, the Government's key witness was a cooperator named Michols Peña, a member

of a robbery crew that targeted individuals in possession of high-end watches.  During trial, he

described the eight robberies of luxury watches he and other associates (including a man named

Victor Rivera) committed between October 2019 and August 2020 in Queens, Brooklyn, and

New Jersey.  The robberies Mr. Peña testified were committed by his crew were those of:  (1)

Eric Mavachev on October 3, 2019; (2) Edward Rubinoff on October 25, 2019; (3) Vladislav

Aminov on December 10, 2019; (4) Ofir Ben-Shimon on January 14, 2020; (5) Artur Hiaeve on

February 16, 2020; (6) David Sulaymanov on February 20, 2020; (7) Ahmet Sezgin on July 6,

2020; and (8) Jonathan Cheban on August 2, 2020.

Mr. Peña testified that, after the first three of these robberies (of Messrs. Mavachev,

Rubinoff, and Aminov), he subsequently sold the stolen watches to Mr. Yakubov.  Tr. 249, 271,

276-77, 281, 285, 296.  He failed, however, to identify Mr. Rubinoff's watch when he was

shown it, although he testified he was "confident in [his] memory" of what it looked like.  Tr.

379.  As to a fourth watch, the one stolen from Mr. Hiaeve on February 16, 2020, Mr. Peña

testified that he had heard from Mr. Rivera (whom he described as untrustworthy) that Mr.

Yakubov had bought it.  Tr. 304-05, 382, 390.

Mr. Peña testified in relevant part about the watches he said he sold to Mr. Yakubov as

follows.  As to the first of the sales, Mr. Peña testified he did not know Mr. Yakubov or

---

[4] This brief discusses only the aspects of the Government's case relevant to this motion.

otherwise have his contact information but went with Mr. Rivera and Mr. Rivera's friend to the store where Mr. Yakubov worked.  Tr. 265, 267-69, 369-71.  Mr. Peña further testified that, after staying in the store for approximately 30 minutes, he heard Mr. Yakubov say something to the effect of:  "[Y]ou don't have to tell me where you got it from; I know where you got it from. . . . I don't like the guy . . . [H]e got robbed three months ago for a Patek."  Tr. 270.  Mr. Peña ascribed the same level of confidence to his memory of this statement as he did to his (mistaken) description of Mr. Rubinoff's watch.  Tr. 379-80.  He also testified no one, including Mr. Yakubov, ever said to him, "I know this watch is stolen," during the interaction.  Tr. 458.

Mr. Peña also testified that, during the sale of Mr. Aminov's watch in December 2019, Mr. Yakubov's uncle entered the room, and Mr. Yakubov showed Mr. Peña a different watch until his uncle left the room.  Tr. 297-98.

As to the other four watches, Mr. Peña did not claim – and the Government did not argue – that Mr. Yakubov purchased them, notwithstanding the allegation in the Superseding Indictment that Mr. Yakubov participated in a conspiracy of approximately a one-year duration. Instead, Mr. Peña's testimony indicated his understanding that Mr. Yakubov had either not been approached to buy or had refused to buy these watches, or that, in one instance, he had put off Mr. Peña and Mr. Rivera.  *See* Tr. 306-07, 310-11, 315-19, 387.

Whether or not he claimed a particular watch was ultimately purchased by Mr. Yakubov, Mr. Peña consistently testified that he *never* had an agreement with Mr. Yakubov to sell him stolen watches.  Regarding the October 2019 sale of Mr. Mavachev's watch, Mr. Peña testified as follows:

Q:     And you didn't make any plans that day with Mr. Yakubov to meet again?
A:     No.
Q:     You did not enter into an agreement of any kind with Mr. Yakubov that day to meet again?

5

A:      No.
Q:      You made no plans for getting back in touch?
A:      Not that -- not that day.

Tr. 371.  Regarding the sale of Mr. Rubinoff's watch in October 2019, Mr. Peña testified:

Q:      So you did not reach an agreement of any kind with Mr. Yakubov before you showed up at the Queens Colosseum on October 26th?
A:      Correct.
Q:      So you had no agreement with him at that time?
A:      No.
. . .
Q:      . . . [Y]ou had not previously texted him?
A:      No.
Q:      And you had no agreement?
A:      No.

Tr. 376.  Regarding the sale of Mr. Aminov's watch in December 2019, Mr. Peña testified that because he was called in to assist with the robbery at the last minute, he had no personal knowledge of what happened before it.  Tr. 380-81.

Mr. Pena testified similarly regarding the watches he did not claim to have sold to Mr. Yakubov. Regarding the robbery of Mr. Ben-Shimon in January 2020 and of Mr. Sulaymanov in February of that year, Mr. Peña testified that he had no personal knowledge of those robberies, Tr. 387, and that he was not aware of any agreement with Mr. Yakubov concerning them:

Q:      And you didn't have any agreement with Mr. Yakubov about a watch belonging to Pristine [Mr. Ben-Shimon's jewelry store]; right?
A:      No.
Q:      And you didn't have any kind of agreement with Mr. Yakubov about a watch belonging to David Yurman [Mr. Sulaymanov's nickname]; right?
A:      Correct.
Q:      And you don't know of any agreement that Mr. Rivera had with Mr. Yakubov about either of those watches; right?
A:      Right.

Tr. 387-88.  Regarding the February robbery of Mr. Hiaeve's watch, committed by Mr. Peña's associate, Mr. Rivera, Mr. Peña again testified:

Q:      So you have no personal knowledge of that robbery; right?

6

> A:     No. Because I wasn't there, no.
> . . .
> Q:     And you had no agreement with Mr. Yakubov about any watch relating to
> Avianne Jewelers [Mr. Hiaeve's company]; right?
> A:     Correct.

Tr. 388-89.  Regarding the July 2020 robbery of Mr. Sezgin's watch, Mr. Peña similarly

testified:

> Q:     Am I correct that your testimony is that you did not sell that watch to Mr.
> Yakubov?
> A:     No, we did not.
> Q:     So you had no agreement with Mr. Yakubov to buy that watch?
> A:     No.
> Q:     You never entered into an agreement with Mr. Yakubov to buy that watch?
> A:     No.

Tr. 390-91.  Finally, with regard to the August 2020 robbery of Mr. Cheban, who is also known

as "Foodgod," Mr. Peña testified as follows:

> Q:     There was no agreement in advance with respect to any kind of watch from
> Mr. Food God?
> A:     Correct.
> Q:     . . . Mr. Yakubov did not buy the watch from Mr. Food God?
> A:     No.

Tr. 395.  Near the conclusion of his testimony, Mr. Peña again agreed that he had "no agreement

with Mr. Yakubov."  Tr. 455.

The Government also presented testimony from technical witnesses, who gave evidence

about the robbery crew's whereabouts before, during and after the robberies, as well as their

contacts with Mr. Yakubov.  This evidence did not, however, call into question or otherwise bear

on Mr. Peña's understanding that he did not have an agreement with Mr. Yakubov.

### b.  Evidence Concerning Mr. Yakubov's Knowledge of the Robberies

The Government attempted to demonstrate Mr. Yakubov's knowledge of the cooperator's

activities, and thus his knowledge that watches he purchased or was given the opportunity to

purchase were stolen, in two primary ways:  (1) through what Mr. Yakubov could have learned

from talk amongst members of "his community;" and (2) through instances in which Mr.

Yakubov did not use his business's record-keeping system or Instagram page to document his

alleged possession of certain of the watches.[5]

The evidence from robbery victims regarding the extent to which they were familiar with

Mr. Yakubov and to which the robberies were publicized varied.  None of the victims was

friends with Mr. Yakubov, but some knew him as a personal or professional acquaintance.  Tr.

46-47, 60 (Mavachev), 133-34 (Ben-Shimon), 195-96 (Rubinoff), 220 (Sulaymanov).  Two

witnesses testified that they knew of the jewelry store where Mr. Yakubov worked, Jakoby's

Jewelry, and one testified that the store was owned by Mr. Yakubov's father and uncle, not Mr.

Yakubov.  Tr. 61-62, 150.  Other witnesses did not know Mr. Yakubov at all.  Tr. 180 (Sezgin),

235 (Cheban), 768 (Aminov), 777 (Hiaeve).

There was testimony concerning the fact that six of the eight victims were members, like

Mr. Yakubov, of the Bukharian Jewish community, *see, e.g.*, Tr. 197-98, but not all victims in

this group knew Mr. Yakubov, *e.g.*, Tr. 768.  Certain witnesses testified that both luxury watch

dealers and members of the Bukharian Jewish community "talk to each other," Tr. 45, 220-21,

and one witness testified that he heard of the first two robberies almost immediately after they

occurred, Tr. 766-67.  In contrast, the witness who testified in the greatest detail about the news

of the robberies spreading said that he was unsure whether he had heard of anyone being robbed

before he was, that at least one of the victims tried to keep the fact of his robbery "low," *i.e.*,

---

[5] Although Mr. Yakubov told Detective Smith that he knew robberies of luxury watches had
occurred, Tr. 654, this interview took place in October 2020, after the last of the robberies at
issue in the case.

quiet, and that word got out about the robberies only after the Hiaeve robbery in February 2020. Tr. 205, 206, 210, 211.

Only one witness thought that he might have told Mr. Yakubov that he had been robbed, and his testimony to that effect was not credible. Mr. Mavachev stated that, although he had never told the Government as much in his many meetings with them, nor had he mentioned it in his direct examination, that he may have "DMed [direct messaged Mr. Yakubov] about it through Instagram." Tr. 58-59. Although other evidence concerning Instagram was presented at the trial, no message fitting this description was introduced, let alone produced in discovery.

The Government also argued during trial that the lack of evidence that Mr. Yakubov made certain records of possessing the stolen watches pointed to Mr. Yakubov's understanding that the watches were contraband. In this regard, the Government relied on evidence that the store where Mr. Yakubov worked contained records of other transactions but not those pertaining to the stolen watches. Tr. 872. The Government also pointed to the fact that photographs of the stolen watches were not posted to the Instagram page for Jakoby's Jewelry. Tr. 874-75.

## LEGAL STANDARD

Rule 29 requires that, notwithstanding the jury's return of a guilty verdict, the Court "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). Although it is generally the role of the jury to weigh the evidence, "[i]t is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972); *see also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (when evaluating a Rule 29 motion, "specious inferences are not indulged because [it] would not satisfy

the [Constitution] to have a jury determine that the defendant is *probably* guilty." (internal quotation marks and citation omitted; emphasis in original)).

The critical question on a Rule 29 motion is whether "any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," and the verdict to the contrary must be overturned. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted). In engaging in this analysis, courts "consider the evidence presented at trial in its totality, not in isolation." *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou,* 428 F.3d 361, 369-70 (2d Cir. 2005)).

## ARGUMENT

**I.   The evidence at trial was insufficient to establish that Mr. Yakubov entered into an agreement to commit money laundering offenses.**

Mr. Peña's repeated testimony that he did not enter into an agreement with Mr. Yakubov is dispositive as to the non-existence of a conspiracy in this case and requires that a judgment of acquittal be entered as to Count One.

### a.  Applicable Law

"The essence of conspiracy is agreement." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010); *see also, e.g.*, *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) ("A conspiracy is an agreement among the conspirators. A meeting of minds is required." (internal quotation marks and citations omitted)); *Valle*, 807 F.3d at 522 ("We have taken a bilateral approach to the crime of conspiracy: at least two people must agree."). That meeting

of the minds must occur as to the specific object of the conspiracy.  *See, e.g.*, *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) ("The conspirators must agree to commit an object crime.").

Although the alleged co-conspirators need not agree as to all of the details of the conspiracy, they must agree to enter "into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent."  *Torres*, 604 F.3d at 65 (collecting cases); *see also United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009) ("Conspiring to launder money requires that two or more people agree to violate the federal money laundering statute").  It is *not* enough for the Government to present evidence of "a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity."  *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (internal quotation marks omitted).

### b.  Argument

For Mr. Yakubov's conspiracy conviction to be sustained, he must have entered into an agreement with Mr. Peña and others in the robbery crew not merely to purchase a watch but to engage in the concealment and transaction money laundering offenses described in the Superseding Indictment.  Mr. Peña was the only witness at trial who could offer direct testimony about the nature and extent of any agreement with Mr. Yakubov, and he repeatedly and explicitly stated that he had no such agreement at all.  The Government itself endorsed the credibility of that testimony.  *See, e.g.*, Tr. 836 (Government statement in closing, "how do you know Michols Peña is telling you the truth? . . . [H]is demeanor, his incentives and the corroboration.").

Even crediting for the sake of this specific argument the remainder of the Government's contentions regarding Mr. Yakubov's purchases of certain watches, Mr. Peña's testimony is fatal to the Government's case.  *See, e.g.*, *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998)

11

(evidence of purchase of contraband, without more, insufficient to establish that defendant entered into agreement necessary to sustain conspiracy conviction); *cf. also United States v. Wardy*, 777 F.2d 101, 107 (2d Cir. 1985) ("request [by one defendant] through an intermediary for [co-defendant] to retaliate against a witness" did not constitute conspiracy because there was "no showing of any . . . agreement to retaliate").  It is simply not enough under the law that Mr. Yakubov and Mr. Peña were in contact with each other, or that Mr. Yakubov may have bought one or more watches from Mr. Peña or his associate Mr. Rivera.  *See, e.g.*, *Ogando*, 547 F.3d at 108 (fact that group of drug dealers regularly sought out defendant, a cab driver, to transport drugs did not indicate he was in a conspiracy with them; the use of defendant's car "may [have] be[en] probative of *their* state of mind, but it [was] not probative of *his*.").

Other aspects of Mr. Peña's testimony also indicate that Mr. Yakubov was not part of the money laundering conspiracy to which Mr. Peña eventually, and reluctantly, pled guilty.[6]  For example, Mr. Peña testified that there were watches Mr. Yakubov refused to buy, Tr. 306, 310-11, and that Mr. Yakubov knew nothing about, Tr. 387.  This testimony supplements Mr. Peña's disavowal of an agreement with Mr. Yakubov, which alone makes clear that there was no meeting of the minds between them and requires an acquittal on Count One.

## II.   The Government failed to offer sufficient proof that Mr. Yakubov knew any watches he purchased were stolen.

The Government's proof concerning Count One falls short in another respect:  Mr. Yakubov's knowledge that the watches at issue were in fact stolen.

---

[6] Mr. Peña testified at trial that, prior to pleading guilty, he participated in an aborted plea proceeding in part because he was unable to allocute to having participated in a money laundering conspiracy, and did not believe he had done so.  Tr. 340-41, 349.

### a. Applicable Law

In order to prove conspiracy, in addition to showing the defendant's agreement with another, the Government must show that the defendant "knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (internal quotation marks omitted); *accord Lorenzo*, 534 F.3d at 159. Both objects of the conspiracy charged by the Government require Mr. Yakubov to have known that the watches the robbery crew was selling were the product of criminal activity.

In order to violate Section 1956(a)(1)(B)(i), or commit concealment money laundering, one must "know[ ] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" and conduct the transaction "knowing that [it] is designed . . . to conceal . . . the nature [or] . . . source . . . of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); *see also Garcia*, 587 F.3d at 516-17 (this provision of the statute "requires proof that the purpose—not merely [the] effect—of the [transaction] was to conceal or disguise a listed attribute of the proceeds" (internal quotation marks omitted)).

Similarly, "[t]he offense of transacting property derived from a specified unlawful activity under 18 U.S.C. § 1957 requires a showing of knowledge that the money at issue was 'criminally derived property.'" *United States v. Odiase*, 788 F. App'x 760, 762 (2d Cir. 2019). "Criminally derived property" is defined in the statute as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Without knowing that the watches were stolen, in other words, Mr. Yakubov could not have knowingly conspired to conceal or transact in the proceeds of a crime.

13

### b.  Argument

Setting aside the wholly incredible and uncorroborated testimony of Mr. Mavachev that he alerted Mr. Yakubov to the October 2019 robbery of his watch,[7] there was no direct evidence presented at trial that Mr. Yakubov knew about the robberies contemporaneous to their occurrence.  This is so even accepting for purpose of this motion Mr. Peña's testimony that Mr. Yakubov made a statement that he knew where one of the watches came from.  Mr. Yakubov's statement, as recalled by Mr. Peña, was, at best, ambiguous and did not speak to Mr. Yakubov's knowledge about whether that watch had been stolen.  As Mr. Peña admitted, Mr. Yakubov never said he was aware that the watch was stolen, Tr. 458, or that he knew Mr. Mavachev had been robbed more recently than an incident months before.[8]

As a result of the lack of direct evidence that Mr. Yakubov was aware of the robberies, the Government relied heavily upon the testimony of the victims to suggest it was likely that Mr. Yakubov would have heard about the specifics of these crimes by virtue of his membership in a community.  The Government variously defined this community as one of luxury watch dealers, members of the Bukharian Jewish faith, or "high-end luxury watch dealers who live in the Fresh Meadows [area] of Queens in the Bukharian Jewish community."  *See, e.g.*, Tr. 859.  But, the evidence the Government attempted to elicit from the robbery crew's victims was mixed and provided no assurance that Mr. Yakubov would have learned about the robberies based on his

---

[7] *See United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014) ("deference to the jury's verdict" when evaluating the sufficiency of the evidence does not "mean that if there is *any* evidence arguably in support of a verdict, [the court] must" uphold it) (emphasis in original).

[8] In any event, the statement, if made, is inadequate to support Mr. Yakubov's conviction for conspiracy to commit money laundering.  *Cf. Kapelioujnyj*, 547 F.3d at 154 (defendant's passing remark, "Christmas is coming," concerning stolen property insufficient to show knowledge of value of that property, as was required for conspiracy to sell stolen property conviction).

profession or, certainly, his ethnicity.  As discussed *supra*, not all the victims even knew Mr.
Yakubov, nor did they agree on when news of the robberies spread.  The most specific testimony
on this issue, from Mr. Rubinoff, suggested that Mr. Yakubov would *not* have heard about the
robberies until after he purchased any watches from Mr. Peña.  In short, no inference can be
drawn from this testimony regarding Mr. Yakubov's knowledge, despite the Government's many
attempts to elicit a more damning narrative.  This evidence cannot support Mr. Yakubov's
criminal conviction.  *See United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (reversing
conspiracy conviction where evidence, "viewed in the light most favorable to the Government,
remain[ed], at best, in equipoise.")

What remained of the Government's case on knowledge after the victim-witness's
inconsistent testimony was merely evidence that Jakoby's Jewelry did not keep records of the
stolen watches or advertise them on the company's Instagram account.  Substandard record-
keeping or a lack of publicity by themselves of course do not not equate to knowledge that
something has been stolen, let alone an intent to conceal that fact.  *Cf. Garcia*, 587 F.3d at 519
("Avoiding a paper trail, or declining to declare income, while perhaps frequently attendant to a
broader purpose of concealment, no more demonstrates that the transfer and delivery were
undertaken in order to conceal than does the mere fact of concealment during the transaction.");
*United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999) ("Conceal" in the money
laundering statute "implies conduct entailing deception that goes beyond merely acting in a way
that avoids compulsory disclosure.").

The Government's conspiracy charge depends upon its ability to prove that Mr. Yakubov
knew that the watches were stolen.  The evidence presented at trial on this point is too slender a
reed to support such a major part of the Government's case, in particular the dubious proposition

15

that Mr. Yakubov might have heard something around a community that the Government has failed to even define consistently.  The conviction on Count One should be vacated on this basis. *See, e.g.*, *United States v. Evergreen Int'l*, 206 F. App'x 71, 75-76 (2d Cir. 2006) (vacating money laundering conviction where Government could not prove that defendants knew about the fraudulent trading that generated the illicit proceeds).[9]

### III. The Government failed to prove that Mr. Yakubov engaged in a transaction involving a financial institution.

#### a. Applicable Law

As discussed above, Mr. Yakubov was convicted of conspiring to engage in two types of money laundering:  concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and transaction money laundering, in violation of § 1957.  The second of these types of money laundering, transaction money laundering, requires the engagement by the defendant in a "monetary transaction," defined by Congress as a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution."  18 U.S.C. § 1957(f)(1).  This definition of "monetary transaction" includes conduct covered by 18 U.S.C. § 1956(c)(4)(B), which in turn discusses "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect,

---

[9] To the extent the Government will rely on any of the evidence supporting Mr. Yakubov's convictions under Counts Two and Three to establish that he had knowledge about the robberies, this too would be unavailing.  The Second Circuit has held that, "[w]hile false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt," "falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where," as here, "other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt."  *Ogando*, 547 F.3d at 109 (internal quotation marks omitted).

interstate or foreign commerce in any way or degree." *See* 18 U.S.C. § 1957(f)(1) (citing 18 U.S.C. § 1956(c)(4)(B)).

A financial institution means, among other things, "a dealer in precious metals, stones, or jewels." 31 U.S.C. § 5312(a)(2)(N); *see also* 18 U.S.C. § 1956(c) (defining financial institution, for purposes of both § 1956 and § 1957, as any institution "defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder").

While concealment money laundering may or may not involve the use of a financial institution, *see United States v. Leslie*, 103 F.3d 1093, 1101 (2d Cir. 1997) ("the government must prove . . . either . . . that the transaction affected interstate commerce, or . . . that the transaction involved a financial institution"), Section 1957 requires the involvement of such an institution, *see, e.g.*, *United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) ("[I]n order to sustain a § 1957(a) conviction, a financial institution must have been involved."). Mere use of funds from unlawful activity does not suffice to show the involvement of a financial institution. *United States v. Dominguez*, 954 F.3d 1251, 1256-57 (9th Cir. 2020), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2857 (2022), and *reinstated in relevant part by* 48 F.4th 1040 (9th Cir. 2022) (holding that defendant's purchase of motorcycle using funds from a Hobbs Act robbery did not establish the transaction involved a financial institution); *see also Ness*, 565 F.3d at 79 (Government's failure to demonstrate at trial that defendant or his business were one of the enumerated institutions in 31 U.S.C. § 5312(a)(2) warranted acquittal on transaction money laundering charge).

### b. Argument

There was no dispute at trial that Mr. Yakubov worked at a jewelry store, one of the entities included in the definition of a financial institution. But, the Government never proved

that any actions it asserts were in furtherance of a money laundering conspiracy were "by, through, or to" the jewelry store.  Instead, viewed in the light most favorable to the Government, the evidence demonstrated the opposite:  there was testimony that Mr. Yakubov did not own the store, Tr. 150; that he did not involve his uncle in the purchase of one of the watches, Tr. 297-98, 300; that he did not use the receipt or record-keeping system of the store to record any of these transactions, Tr. 699-701; and that he was able to post pictures on the business Instagram page but did not do so for these watches, *see, e.g.*, Tr. 475-76.  Finally, there was no evidence adduced that the watches were located at the store or became part of the store's inventory.  All of this evidence suggests that the "financial institution" – the jewelry store – was completely divorced from any activity pertaining to the money laundering conspiracy.

During oral argument on this motion, the Government suggested that the definition of a "dealer in precious metals, stones, or jewels" may also be read to encompass an individual.  Tr. 795.  The statute is not explicit on this point, and the defense has not located a legal precedent to support it.  The fact that some of the enumerated institutions in the statutory provision *do* discuss "persons" or clearly encompass both people and entities (for example, "an investment banker or investment company," § 5312(a)(2)(I)), seems to cut against the Government's argument that the word "dealer," which does not discuss "persons," should be interpreted expansively.

Moreover, the fact that Congress distinguished other money laundering offenses from those in Section 1957 that require a financial institution suggests that the intent of the statute is to protect such institutions from becoming conduits for illicit proceeds.  *Cf. United States v. DiCristina*, 726 F.3d 92, 96 (2d Cir. 2013) ("[T]he 'whole act' rule of statutory construction exhorts us to read a section of a statute not in isolation from the context of the whole Act but to look to the provisions of the whole law, and to its object and policy." (internal quotation marks

omitted)).  Convicting Mr. Yakubov of engaging in transaction money laundering without proof of any institutional involvement subverts that statutory purpose and should not be countenanced here.

**IV.   The Government failed to establish that the appropriate venue for Counts Two and Three is the Southern District of New York.**

    **a.  Applicable Law**

"Both the Sixth Amendment and [Federal Rule of Criminal Procedure] 18 require that a defendant be tried in the district where his crime was 'committed.'"  *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).  It is the Government's burden to prove venue.  *Id.*  A crime is committed, and therefore venue is proper, "where an essential conduct element of the crime took place."  *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005).

A false statement charge may be prosecuted in the district where the statement is made. *See, e.g.*, *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990); *United States v. Bin Laden*, 146 F. Supp. 2d 373, 380 (S.D.N.Y. 2001).  The Second Circuit has also held that the venue for a false statement charge may be proper in the district where that statement had an effect on a federal official because materiality is an element of a Section 1001 offense.  *See Coplan*, 703 F.3d at 79-80 (holding that, where defendant made statements at IRS deposition in Tennessee, and those statements were subsequently analyzed by the IRS in the Southern District of New York, the New York venue was appropriate for false statement charges); *accord United States v. Wilson*, 512 F. App'x 75, 78 (2d Cir. 2013).

    **b.  Argument**

The record is clear that the two interviews of Mr. Yakubov that are the subjects of the false statements charges took place in Queens, outside of the Southern District of New York. *See* Tr. 642, 679.  Unlike *Coplan*, discussed *supra*, the interviews here were conducted by the

very same officers working on the investigation, Detectives Smith and Special Agent Guzman, and therefore Mr. Yakubov's statements were not transmitted to the Southern District to be reviewed or analyzed in any real sense.  They were made, received, and taken into account in Queens.  Accordingly, venue on these charges would have been appropriate in the Eastern District.  The Government's failure to establish that venue was proper in this District warrants a judgment of acquittal on Counts Two and Three.

## CONCLUSION

For all of the foregoing reasons, we respectfully submit that Mr. Yakubov's motion pursuant to Federal Rule of Criminal Procedure 29 should be granted.

Dated: New York, New York
April 1, 2023

SPEARS & IMES LLP


By:  _____/s/_____

Max Nicholas
*Attorney for Defendant Stanislav Yakubov*